# MCLAUGHLIN & STERN, LLP

ARMAND M. PARÉ, JR.
Direct Phone (212) 952-6201
EMail: jpare@mclaughlinstern.com

260 MADISON AVENUE
NEW YORK, NEW YORK 10016
(212) 448-1100

Millbrook, New York
West Palm Beach, Florida

August 2, 2013

<u>VIA FACSIMILE</u>                    **(212) 805-6390**

Honorable William H. Pauley, III
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room
Room 2210, Courtroom 11D
New York, NY 10007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 8 20 13

      Re:     LAURITZEN BULKERS, A/S vs.
               JIT INTERNATIONAL CORPORATION LIMITED
               and PALMAILLE HOLDINGS LTD. and vs.
               HSBC Bank USA, N.A.,
               <u>Case 1:13-cv-03982 (WHP)</u>

Dear Judge Pauley,

## INTRODUCTION

    We represent defendant, JIT International Corporation Limited ("JIT") which appears by

restrictive appearance pursuant to Rule E (8) of the Supplemental Rules for Admiralty and

Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") of the Federal Rules of

Civil Procedure to vacate plaintiff's attachment and to provide JIT's response to the Court's

order that the parties submit letters regarding the request of Garnishee, HSBC Bank USA, N.A.

("HSBUS") which seeks only a partial vacating of the writ of attachment obtained by plaintiff,

Lauritzen Bulkers A/S ("Lauritzen").

## SUMMARY OF JIT'S POSITION

As shown in the attached declaration of JIT's Zhang Hui, JIT has no funds nor property in the district and does not do business in this district. However, JIT's bank in Hong Kong, the Hong Kong and Shanghai Banking Corporation Limited ("HSBHK") has treated the Court's Order of Attachment as being binding on it in Hong Kong and has denied JIT access to its funds in JIT's account with HSBHK in <u>Hong Kong</u> by reason of this Court's Order of Attachment. As outlined herein, JIT's funds and account in Hong Kong should not be subject to attachment by process issued by this Honorable Court. Given the lack of any property of JIT in this district, the lack of legal basis for an attachment restraining funds outside the district, and the fact that Lauritzen's claim against JIT is subject to arbitration in London, the Court should vacate the Order of Attachment in its entirety and HSBHK should be directed to release all funds of all defendants from restraint.

Furthermore, Lauritzen's claim against JIT is one that sounds in indemnity and is, insofar as is presently known, only a hypothetical claim over against JIT since Lauritzen has not yet suffered the damages it claims against JIT and Lauritzen may never suffer them. In fact, the claim in question was asserted against Lauritzen in indemnity by the vessel owner only because the vessel owner had received a cargo claim from cargo interests but there is no indication that the vessel owner itself has paid the underlying claim. Under well-accepted prevailing principles, no maritime attachment should issue in respect of such an indemnity claim and the Order of attachment should be vacated for this further reason. In fact, Plaintiff's indemnity claim is governed by the terms of the "Interclub Agreement and, under decisions of this Court, no attachment should issue in this case under the indemnity rule.

Finally, if the Court should not vacate the Order of Attachment, JIT reserves its rights to request countersecurity as set forth in Rule E (7) of the Supplemental Rules.

## SUMMARY OF FACTS CONCERNING THE UNDERLYING CLAIM

The M/V OCEAN PREFECT carried the cargo in question from Xingang and Shanghai, China to Guanta, Venezuela. According to Lauritzen's own papers, Lauritzen chartered the vessel from the vessel owner, Lomar Charters Limited ("Vessel Owner"). Lauritzen, in turn, chartered the vessel to JIT and JIT, in turn, subchartered the vessel by fixture notes to Tianjin Ruicheng International Transportation Co., Ltd. ("Tianjin") and Qingdao Shitian International Logistics, Ltd. ("Qingdao"). It is not known whether Tianjin and Qingdao entered into contracts with others for transportation or delivery of the cargo in question. The vessel apparently encountered heavy weather en route and the cargo in question was allegedly damaged. Cargo interests (whose exact identities are unspecified) apparently made claims against the Vessel Owner in Venezuela. Little is known about the underlying cargo claims other than Lauritzen asserts a claim against JIT in indemnity in the amount of $20 million dollars. No specifics have been provided. The status of the cargo claims in Venezuela is unknown but it does not appear nor has it been alleged that the Vessel Owner or Lauritzen have either paid or resolved these claims.

The Vessel Owner has apparently provided a "letter of undertaking" from its Protection & Indemnity Club ("P&I Club) to secure the claim asserted against the Vessel Owner by cargo interests in Venezuela. Lauritzen, which is also an owner of other vessels and is also a member of a P&I Club, has had its P&I Club give a Club letter of undertaking to the Vessel Owner on account of the Vessel Owner's indemnity claim asserted by it against Lauritzen for possible liability for the cargo damage.

3

Vessel owners typically insure certain risks, including risks for cargo loss and damage, with P&I Clubs, which are mutual insurance companies whose members are other vessel owners. These clubs are operated by managers. As a service to their members, P&I Clubs, through their managers, will routinely provide a "letter of undertaking" from the Club to secure claims asserted against a vessel owner or its vessel. This allows the vessels to avoid or to be released from arrest on account of routine (or otherwise) claim. The issuance of a letter of undertaking from a P& I Club comes at no expense to its member. JIT is not a ship owner and is not a member of a P&I Club and has no ability to provide a P&I Club letter of undertaking.

The charter party between Lauritzen and JIT provides for arbitration of disputes in London. It also contains an incorporation of the "Interclub Agreement." Clause 55 of the charter states:

> Liabilities for cargo claims, including customs fines if imposed shall be borne by Owners/Charterers in accordance with the Interclub New York Produce Exchange Agreement of 1966 and any amendments thereto. The party having paid the claim shall submit to the other party supporting documentation as soon as possible.

(emphasis added)

The "Interclub Agreement" (which is attached to the annexed declaration of Zhang Hui) provides a formula for an owner and charterer to apportion liability for any cargo damage between them. The Agreement contemplates that it is triggered when one of the parties settles and pays a claim for cargo damage asserted by third party cargo interests. The plain words of the Interclub Agreement require that a cargo claim be properly settled and paid and that the "amount" of the cargo claim first be "in fact borne" by an owner or charterer *before* that entity

4

can then claim apportionment against the other under the Interclub Agreement. Clause 4 (c) requires that:

> the claim has been properly settled or compromised and paid.

> (emphasis added)

The "apportionment" section of the Interclub Agreement further provides:

> The amount of any Cargo Claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charterparty seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charter party.

> (emphasis added)

As indicated, Lauritzen does not allege it has either paid or settled the underlying cargo claims nor has Vessel Owner done so. In the circumstances, Lauritzen has not yet settled and paid or "in fact borne" an "amount" respecting the cargo claims and, hence, is not in a position to seek apportionment from JIT under the charter.

Although Lauritzen alleges in paragraph 14 of its Complaint that "JIT is similarly obligated to provide security for claims by Lauritzen," this is clearly not so. Even if it were, however, that would be an issue for London arbitrators and Lauritzen's claim in this regard should be dismissed in favor of London arbitration.

### FACTS CONCERNING THE LACK OF JIT FUNDS OR PROPERTY IN NEW YORK, THE ACTION BY HSBHK TO RESTRAIN JIT'S FUNDS *IN HONG* KONG AND THE ACTION OF HSBUS

As indicated above and in the annexed declaration of JIT's Zhang Hui, JIT has funds located in Hong Kong with the Hong Kong bank, HSBHK. JIT has no funds with HSBUS nor

5

does it have any other funds or property in this district nor does it do business here. HSBHK, however, has, surprisingly, taken the Court's Order of Attachment as applying to it in Hong Kong and restrained JIT's funds in Hong Kong. HSBHK has apparently done this because the Order provides it may be served "upon garnishee Hong Kong and Shanghai Banking Corporation ... via service on HSBC Bank USA, N.A." In fact, the Complaint alleges in paragraph 22 that this Court has jurisdiction over HSBHK "due to its correspondent account in New York at HSBC Bank USA, N.A. and its possession of funds of the Defendants." The Order of Attachment also recites "The Verified Complaint and The Declaration and Supplemental Declaration of James H. Powers demonstrate that Defendant's (tangible or intangible) property is contained within Correspondent Bank accounts that are located in this district." Both of these points have been specifically refuted by HSBUS which has stated in his Report of Garnishee at paragraph 6:

> HBUS has examined HBAP's [i.e., HSBHK's] correspondent
> account and has determined that this account contains no
> "subaccount" for Defendants.

Hence, clearly, Plaintiff has failed in its burden to show that the defendants have funds in the district. This, alone, requires vacation of the Order of Attachment as outlined below.

As indicated, HSBHK has restrained funds of JIT held *in Hong Kong*. There is no legal basis for this extraterritorial restraint of JIT's property. Since HSBHK has done so because it considers itself subject to the jurisdiction of this Court, it should be ordered forthwith to release its restraint on all funds and accounts it has restrained.

It also appears as though HSBUS has taken the Court's Order of Attachment literally, and because the Order provides "HSBC Bank USA shall restrain $20,000,000.00 in the Correspondent Bank account of its customer Hong Kong and Shanghai Banking Corporation

6

Limited," HSBUS has apparently set aside $20,000,000.00 in its correspondent account for HSBHK. There seems no legal basis for this as well.

## POINT I

### THE ORDER OF ATTACHMENT SHOULD BE DISMISSED AS PLAINTIFF HAS FAILED IN ITS BURDEN TO SHOW THAT DEFENDANT(S) HAVE FUNDS WITHIN THE DISTRICT

It is respectfully submitted that, since JIT holds no funds and has no account in this district, the Order of Attachment issued in the case should be vacated and the action dismissed, in favor of London arbitration. Even under the now overruled case of Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd., 460 F.3d 434, 445 (d Cir. 2006), a plaintiff was required, as part of its *prima facie* case in seeking a maritime attachment, to show "the defendant's property may be found within the district." In the waning days of EFT attachments under Rule B, this Court routinely dismissed attachments where the plaintiff failed in its burden to show that a defendant's funds were found within the district. In Arctic Ocean Int'l, Ltd. v. High Seas Shipping, Ltd., 2009 U.S. Dist. LEXIS 34907 (S.D.N.Y. 2009), for example, this Court said:

> The fact that Rule B attachment orders are increasingly being issued subject to expiration dates also suggests that there is a temporal limit to when property must be attached. In *Marco Polo*, for example, Judge Koeltl issued a Rule B attachment valid for only sixty days – if no property was attached within that period, the attachment order would automatically expire unless plaintiff established cause for an extension. 2009 U.S. Dist. LEXIS 19057, 2009 WL 562254, *1. After the sixty-day window expired without any property being attached, Judge Koeltl dismissed the compliant, finding that "the requirement that the defendant's property be found in the district" had not been satisfied. 2009 U.S. Dist. LEXIS 19057, [WL] at *2. Plaintiff's allegation that defendant's funds *might* come into the district at some point because defendant transacted some of its business in United States dollars, that Artic

7

makes here as well, was rejected as inadequate grounds for
extending the attachment order...

Id. at page 4

Similarly, in <u>Global Dominion S.A. v. Fairport Shipping Ltd.</u>, 2009 U.S. Dist. LEXIS 69647

(S.D.N.Y. 2009), this Court said:

> These considerations, however, do not absolve Plaintiff of the
> burden of demonstrating to the Court, as part of its showing of
> entitlement to the Process of Maritime Attachment and
> Garnishment, that Defendants' "property may be found within the
> district ..." *Aqua Stoli*, 460 F.3d at 445. In the Court's view, more
> is required to demonstrate a "plausible" entitlement to a maritime
> attachment than a conclusory allegation that Defendants "have or
> will have during the pendency of this action" property at any
> garnishee [sic] in the District.

Id. at p. 2

Since Plaintiff has failed in its burden to show that either defendant has funds within the district,

the Order of Attachment should be vacated and the action dismissed in favor of London

arbitration.

**POINT II**

**THE ATTACHMENT SHOULD BE VACATED
BY REASON OF THE SECOND CIRCUIT'S
DECISION IN JALDHI, BASIC DUE PROCESS
PRINCIPLES AND THE SEPARATE ENTITY RULE**

(A)      The Jaldhi Case

In the case of <u>The Shipping Corporation of India Ltd .v. Jaldhi Overseas Pte Ltd.</u>, 585

F. 3d 58 (2d Cir. 2009), the Court of Appeals for the Second Circuit overruled its prior decision

in <u>Winter Storm Shipping Ltd. v. TPI</u>, 310 F. 3d 263 (2nd Cir. 2002) which had allowed the

attachments in New York of foreign banking credits made through electronic funds transfers

("EFTs") through correspondent banks in New York. The Court of Appeals in Jaldhi stated:

> Our holding of Winter Storm not only introduced "uncertainty into
> the international funds transfer process," *id.*, but also undermined
> the efficiency of New York's international funds transfer business.
> As the Federal Reserve Bank of New York noted in its *amicus*
> curiae brief in support of the motion for rehearing *en* banc by the
> defendant in Winter Storm, "efficiency is fostered by protecting
> the intermediary banks; justice is fostered by expressly telling
> litigants where the process should be served… [Winter Storm]
> disrupt[ed] this balance and threaten[ed] the efficiency of funds
> transfer systems, perhaps including Fedwire." Amicus Br. of
> Federal Reserve Bank of New York 9, Winter Storm, 310 F.3d 263
> (No. 02-7078). Undermining the efficiency and certainty of fund
> transfers in New York could, if left uncorrected, discourage dollar-
> denominated transactions and damage New York's standing as an
> international financial center. *See e.g.,* PEB Commentary 6. n. 4
> ("Winter Storm and its progeny have had a far greater, and
> damaging, potential impact on U.S. and foreign banks located in
> New York than might have been anticipated."); Newman &
> Zaslowsky, 242 N.Y. L.J. at 3.

### 585 F.3d at 62

In the Jaldhi case, the Court made clear that, in the absence of applicable federal maritime law,

"we generally look to state law to determine property rights" 585 F.3d at 70. Under New York

state law, funds at an "intermediary bank" as in the case of an EFT, are not subject to attachment.

The Court in Jaldhi stated:

> Because EFTs in the temporary possession of an intermediary bank
> are not property of either the originator or the beneficiary under
> New York law, they cannot be subject to attachment under Rule B.

### 585 F.3d at 71

JIT's funds are not located in New York nor does JIT maintain a bank account in New

York. Lauritzen nevertheless seeks to bolster its claim against JIT's funds by claiming that

HSBC USA is the "correspondent bank" of HSBC Hong Kong. There is no meaningful

distinction in this argument from that rejected in <u>Jaldhi</u>. JIT's Hong Kong account and funds in said account are not subject to jurisdiction in New York simply because HSBHK has a "correspondent bank" in New York. Indeed, every major bank has a "correspondent bank" in New York (and frequently more than one). The establishment of a "correspondent bank account" is an internal arrangement between banks in different locations for effecting banking transactions and currency conversions. The use of these by banks should not subject the ultimate banking customer, such as JIT to jurisdiction at the situs of the correspondent bank. If the existence of a "correspondent bank" in New York were to give rise to jurisdiction in New York over funds held in a bank account located abroad or wired transferred from it to somewhere else in the world, all the concerns which led to the decision in <u>Jaldhi</u> would once more take root. Here, HSBUS has confirmed it has no "subaccount" of funds for defendants so this ends the inquiry here. Further, even if it did, this would only be a matter of internal banking arrangements for effecting electronic funds transfers and, under <u>Jaldhi</u>, this no longer provides a basis for attachment of a defendant's property.

## (B)   Shaffer v. Heitner – the Core Principle

There is a fundamental constitutional concern behind the core notion that funds of a defendant held abroad or anywhere outside the jurisdiction (or treated by a bank as being in a "subaccount" for internal banking purposes) should not be subject to jurisdiction in this district absent the defendant <u>purposefully availing</u> itself of being subject to jurisdiction. Under <u>Shaffer v. Heitner</u>, 433 U.S. 186 (1977), the Supreme Count extended the constitutional requirements of minimum contacts to quasi-in-rem jurisdiction. In that case a plaintiff holding a single share of stock in Greyhound Corp., a Delaware corporation, sought to sequester in a Delaware state action 82,000 shares of Greyhound stock owned by various defendants, none of which shares

10

were located in Delaware. The stock was considered by the lower court to be in Delaware and so subject to seizure, however, by virtue of Delw. Code. Ann. Tit. 8, 169 (1975) which deems Delaware the situs of ownership of all stock in a Delaware corporation. On writ of certiorari to the Supreme Court, it held that traditional notions of "fair play and substantial justice" which overlay the exercise of personal jurisdiction also apply to quasi-in-rem jurisdiction. The Court found the case for similarly limiting quasi-in-rem jurisdiction to be "simple and straightforward." The Court in that case stated:

> If the argument in favor of restraining the assets not physically present] does not demonstrate that appellants have "purposefully avail[ed themselves] of the privilege of conducting activities within the forum State," Hanson v. Denckla, supra, at 253, in a way that would justify bringing them before a Delaware tribunal. Appellants have simply had nothing to do with the State of Delaware. Moreover, appellants had no reason to expect to be haled before a Delaware court.

186 U.S. at 216

In short, there must be a 'purposeful availing' of the privilege of conducting activities in the forum state. Here, no such situation exists. JIT simply maintained a bank account *in Hong Kong* and did nothing to purposefully subject itself to jurisdiction in New York. Hence, even if HSBUS had a "subaccount" for JIT (which is not the case) that would not subject JIT's property to attachment in New York. Plaintiff's attempted (and so far successful) seizure of JIT's assets held abroad violates fundamental due process.

### (C)   The "Branch Banking" or "Separate Entity" Rule

Under the so-called New York "branch banking" or "separate entity" rule every branch of a bank is considered a separate entity and, because of this, an attachment of an account of a defendant at branch A of a bank does not reach funds of a defendant held in branch B of the same bank. There was some question as to whether this rule survived the Court of Appeals'

11

decision in <u>Koehler v. The Bank of Bermuda Ltd.</u>, 12 N.Y.3d 533, 883 N.Y.S. 2d 763, 911 N.E.2d 825 (2009) which dealt with a <u>post-judgment turn over procedure</u> under New York Civil Practice Law and Rules §5225 (as distinct from a <u>pre-judgment attachment</u> setting which gave rise to the separate entity rule). The later cases, including those of this Court, have held that this rule remains intact as discussed below.

In <u>In the Matter of Parbulk II A/S and Heritage Maritime</u>, 25 Misc. 235, 935 N.Y.S.2d 829, 2011 N.Y. Misc LEXIS 5807 (N.Y. Sup. 2011), the Court, finding <u>Koehler</u> had not abrogated the "separate entity rule," dismissed an attachment since the banks held no funds of the defendant in New York. In <u>Global Technology, Inc. v. Royal Bank of Canada</u>, 34 Misc. 3d 1209; 2012 N.Y. Misc LEXIS 42 (N.Y. Sup. 2012), the court applied the separate entity rule to hold that a branch of a bank did not violate a post-judgment restraining notice which had been served on a different branch. Then, in <u>Shaheen Sports, Inc. v. Asia Insurance Co. Ltd.</u>, 2012 U.S. Dist. LEXIS 36720 (S.D.N.Y. 2012) this Court, disagreeing with earlier rulings in other cases, held that the separate entity rule remained in effect. It therefore refused to order a post-judgment turn-over of funds in Pakistan held by the National Bank of Pakistan which had an office in New York. The Court also expressed due process constitutional concerns with turning over funds not present in the district.

The "separate entity rule" is, of course, all the more forceful when one is dealing with a branch of a bank located abroad (or even outside the district), as here. In such circumstances, due process concerns also arise under the core principle in <u>Shaffer</u>. In short, there is no proper basis for restraining funds of JIT located in Hong Kong merely because HSBHK has a "correspondent bank" in New York. That has, to date, been the effect of the Order of

12

Attachment and, under basic jurisdictional and branch banking principles, it should be vacated with direction to the garnishees to release funds.

**POINT III**

**A CLAIM IN INDEMNITY, ESPECIALLY ONE ARISING UNDER THE INTERCLUB AGREEMENT, IS NOT CONSIDERED "RIPE" OR A VALID MARITIME CLAIM FOR PURPOSES OF ATTACHMENT**

(A)    The Indemnity Rule

In this case, Lauritzen has apparently not been sued by cargo interests. The most that can be said from Lauritzen's Complaint is that Lauritzen has had its P&I Club (at no additional cost to Lauritzen) provide a "letter of indemnity" by which Lauritzen's P&I Club undertook to pay any amount that may be found due and owing by Lauritzen to Head Owner. This letter of indemnity preserves all of Lauritzen's defenses and limitations (see penultimate paragraph of Exhibit "3" to Complaint). Of course, insofar as been pleaded, Head Owner itself has not been found liable either and will, no doubt, claim a heavy weather defense under the applicable version of the Hague Rules. Hence, there is a double layer of "ifs" before Lauritzen's claim in indemnity against JIT becomes "ripe" under decisions in this Circuit.

The landmark case which holds that indemnity claims are not considered "ripe" for purposes of maritime attachment is Greenwich Marine, Inc. v. S.S. ALEXANDER, 339 F.2d 901 (2d Cir. 1965). In that case, Fidelity Shipping, the ship owner, chartered the vessel in question to Greenwich Marine and Greenwich Marine, in turn, subchartered the vessel in question to the Ministry of Supply of the United Arab Republic ("Ministry"). The Ministry alleged cargo damage and refused to pay Greenwich the balance of hire due for carriage of the cargo. As a result of this, Greenwich sued the vessel, the Ministry and Fidelity Shipping, the latter on the

13

theory that if Greenwich should have liability to cargo interests, Greenwich was entitled to indemnity against Fidelity. Greenwich Marine sought and obtained an attachment of Fidelity's vessel to secure its indemnity claim against Fidelity. On motion, the District Court thereafter dismissed the action against the vessel and Fidelity since "this indemnity claim did not state any cause of action justiciable in admiralty but was entirely speculative and hypothetical" 339 F.2d at 9. Greenwich Marine appealed. Then Circuit Judge Marshall, writing for the Circuit Court, affirmed the dismissal, stating:

> But the district court properly held that this claim was premature; no judgment had been entered against Greenwich for the cargo damage, no suit had been instituted against Greenwich for cargo damage, the Ministry, who already appeared in this action, had not sought to cross-libel Greenwich for the cargo damage; and in fact the Ministry had instituted two separate actions against the Alexandra and Fidelity for the same cargo damage. ...

339 F.2d at 9

These facts, plus the additional fact that Fidelity, the ship owner, had provided security directly to the Ministry, are remarkably similar to the facts in this case where the receivers sued and obtained security from the Head Owner in Venezuela. Nonetheless, Circuit Judge Marshall said:

> First, and most importantly, the admiralty judge, who is asked to disregard the prematurity of plaintiff's claim, must be compared to the Chancellor 'balancing the equities,' and we would be entitled to reverse him only if he clearly abused his discretion – which Judge Wyatt surely did not – not simply because we would have resolved the equities differently.
>
> ***
>
> Secondly, although some district judges sitting in admiralty have been willing under certain circumstances to ignore the prematurity of a claim, this does not mean that all doctrines of accrual have been abrogated in admiralty. For example, doctrines of accrual have been a continuing vitality in determining whether a statute of limitations has run. The prematurity objection has been ignored

14

> only in isolated situations under peculiar factual circumstances
> and, to be sure, in some cases it has been sustained. In Mitsui
> Steamship Co. Ltd. V. Jarka Corp., 218 F. Supp. 424 (E.D.Pa.
> 1963), for example, Judge Kraft dismissed an indemnity libel for
> failure to state a cause of action because it was found to be
> premature and 'nothing more than an abstraction,' even though,
> unlike the present case, a suit against the party seeking
> indemnification was pending in another court.

***

> There is an important difference between simply permitting a suit
> to stop the statute of limitations from running and permitting
> seizure of a vessel as security for a claim that may never fully
> ripen. This particular seizure may have only interfered with the
> Alexandra's voyage for a few days before a corporate security was
> substituted, but we are not prepared to say that the seizure and the
> substitution was not costly and burdensome. Fidelity must pay for
> a corporate security and the cost of an Underwriter's Letter of
> Undertaking is reflected in increased premiums. Although a point
> may be reached where it would be fair to put Fidelity to this
> inconvenience, it is not at all clear that Judge Wyatt erred in
> holding that on the facts before him this point had not yet been
> reached.

Based on these considerations that an indemnity claim is premature and is an unfair basis for an

attachment, the Circuit Court affirmed the vacuture of the attachment and dismissal of the libel

against Fidelity. Other more recent cases on this point include J.K. Int'l, Pty., Ltd. V Agriko

S.A.S., 2007 W.L. 485435 (S.D.N.Y. 2007) and Bottiglieri Di Navigazione Spa v. Tradeline,

LLC, 472 F. Supp. 2d 588 (S.D.N.Y. 2007).

## (B)     Further Limitation on Attachments Under the Interclub Agreement

As already indicated, the terms of the incorporated Interclub Agreement require that the

"claim has been properly settled or compromised or paid" and that the "amount" be "in fact

borne by the party to the charter party seeking apportionment." Decisions of this Court squarely

hold that Plaintiff's claim in these circumstances does not give rise to a basis for a maritime

attachment. In T & O Shipping, Ltd. V. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310

(S.D.N.Y. 2006), this Court dealt with the precise question of whether an attachment in an indemnity situation involving a charter subject to London arbitration and English law was proper where the charter included an Interclub Agreement. Judge Scheindlin dismissed the indemnity claim asserted under the Interclub Agreement in that case, stating:

> There is no English cases which deal precisely with the question of whether a cause of action based on the Inter-Club Agreement accrues before or after the cargo claims have been resolved. Not surprisingly, the English barristers retained by the parties, reach opposite conclusions on this question.
>
> T & O has not made a prima facie case showing that it has a maritime claim against Lydia Mar for indemnity. Cargo claims have been filed against T & O by third parties, but they have yet to be resolved. If T & O had paid claims and was in the process of actually seeking indemnity from Lydia Mar, the need for security would be clear. While it seems likely that an indemnity claim cannot be brought before the underlying claim is "properly settled or compromised and paid," the issue of whether the Charter Party requires an accrued cause of action before T & O may bring an indemnity claim remains in dispute. This is a substantive legal question and is not a question that this Court should or will resolve.
>
> (emphasis added)
> 415 F. Supp. 2d at 316

The Court in T & O Shipping therefore dismissed the attachment on the grounds that the plaintiff had failed to make a *prima facie* showing that its claim under the Interclub Agreement was a maritime claim.

This same issue thereafter arose in Sonito Shipping Co. Ltd. V. Sun United Maritime Ltd., 478 F. Supp. 2d 532 (S.D.N.Y. 2007). In that case, Judge Haight reached the same result as Judge Scheindlin but on strictly different grounds. In Sonito Shipping, Judge Haight found that an indemnity claim under the Interclub Agreement was not "ripe" as a matter of English law based on case law. He said:

16

> In the <u>Strathnewton</u> the Court of Appeal stressed that the object of
> the ICA [the Interclub Agreement]"was clearly to cut through" the
> difficulties created by Clause 8 and the Hague Rules in respect of
> the fixing of liability for cargo damage as between shipowner and
> charterer, and added that the "condition precedent" for
> apportionment and indemnification under the ICA was that the
> cargo claims had been paid. "Condition precedent" is a term of art
> in the law; ordinarily, such a condition must be satisfied before an
> obligation arises or a cause of action accrues. This works no unfair
> hardship upon Sonito in this case. Sonito was not required to agree
> to the incorporation of the ICA in the charter party, but having
> done so is bound by it. For these reasons, I conclude that Sonito
> has not carried its burden of showing that at the time of the
> attachment it had a valid maritime claim against Sun United.

478 F. Supp. 2d at 543

The same result was reached by this Court in <u>Precious Pearls, Ltd. v. Tiger Int'l Line Pte Ltd.</u>,

2008 U.S. Dist. LEXIS 58453 (S.D.N.Y. 2008).

Under well-developed principles of this Court, prejudgment attachment should not issue for claims that sound in indemnity.

To put a finer point on this, here Clause 55 of the charter quoted above specifically provides that the Interclub Agreement applies when "[t]he party <u>having paid the claim</u> shall submit to the other party supporting documentation" (emphasis added).

(C)    <u>Note Concerning the Navalmar Case</u>

It is anticipated that Lauritzen will attempt to avoid the indemnity principles adopted by the Second Circuit by referring the Court to Judge Hellerstein's decision in <u>Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.</u>, 485 F. Supp. 2d 399 (S.D.N.Y. 2007), a favorite case cited by plaintiffs in Winter Storm/Rule B days whenever their claims sounded in indemnity. That case is materially distinguishable. In that case, Judge Hellerstein allowed an attachment in an indemnity setting but the facts of that case included the following:

17

- The plaintiff, Navalmar was the actual owner of the vessel M/V Patara (and not a disponent owner as Lauritzen who is separated from the cargo claim by one layer as here).

- Navalmar in that case obtained a bank guarantee at a cost of $38,462.78 to secure the claim for cargo damage asserted by cargo interests in Aden (unlike here where Lauritzen has simply had its Club provide a "Club letter" at no cost to Lauritzen).

- Prior to seeking security in that case, Navalmar had obtained an interim award in London which awarded it $298,559.20 for hire withheld by the charterer because of the cargo claim (plus interest) which the Court and the arbitrators described as an indication the loss of hire was not "the consequence of any breach of charter on the part of [Navalmar]". This was a strong indication that the charterer and not Navalmar would be responsible for the cargo claim.

- Navalmar had expended 76,787.74 Pounds Sterling in connection with London arbitration.

- Navalmar had expended $356,433.16 in defense of the underlying cargo claim in Aden.

Given these expenses, Judge Hellerstein wrote that "In effect, Navalmar has had to prepay the debt owed by it or WGSR [the charterer]" (emphasis added), 485 F. Supp. 2d at 405. Based on these unique circumstances, allowed the plaintiff an attachment in aid of Navlamar's claim against the charterer despite the lack of a final determination of liability against Navalmar or payment of the entire claim by it. The Navalmar case did not contain a clause like Clause 55 of the Lauritzen/JIT charter and is further distinguished for this reason. As the Greenwich Marine case indicates, whether a court should find the general principle of prematurity inapplicable in a given case of indemnity is a matter of the exercise of a district court's equitable powers. Here, equity dictates that the vaguely asserted $20 million dollar indemnity claim should not be the basis of a crippling award of prejudgment security when so little is offered about the "merits" of the claim and where the plaintiff has not settled or paid the claim nor even been put materially out of pocket on account of the underlying cargo claim for which indemnity is sought.

18

It is respectfully submitted that Lauritzen's claim in indemnity against JIT is not "ripe" and does not provide a proper basis for issuance of process of maritime attachment and garnishment. In the circumstances, JIT respectfully prays that process of maritime attachment and garnishment in this case be vacated for this additional reason and, since the underlying dispute is subject to arbitration in London, that the case be dismissed.

## POINT IV

### LAURITZEN'S CLAIM THAT JIT IS OBLIGATED TO PROVIDE SECURITY UNDER THE SUBCHARTER IS WRONG AND IS A DISPUTE SUBJECT TO LONDON ARBITRATION

Lauritzen claims at Paragraph 14 of the Complaint that "JIT is similarly obligated to provide security for claims by Lauritzen". This is entirely unsupported and is wrong. Further, this claim is subject to arbitration in London.

## CONCLUSION

It is respectfully submitted that the Court should vacate the Order of Attachment, dismiss the Complaint pending arbitration in London and direct both HSBUS and HSBHK to release any and all funds and accounts from restraint in this case.

Respectfully submitted,

**McLAUGHLIN & STERN, LLP**

By:

Armand M. Paré, Jr.

AMP/mb
Enclosures

cc: Holland & Knight LLP
James H. Power, Esq.     james.power@hklaw.com
Marie Elizabeth Larsen, Esq.     marie.larsen@hklaw.com

Sullivan & Cromwell, LLP
Alexander John Willscher, Esq.     willschera@sullcrom.com

# DECLARATION OF ZHANG HUI

Ms. Zhang Hui states as follows:

1. I am employed by of JIT International Corporation Limited ("JIT"). I read and speak English.

2. JIT maintains a bank account in Hong Kong with the Hong Kong and Shanghai Banking Corporation Limited ("HSBHK") of No. 1 Queen's Road, Central, Hong Kong.

3. JIT's account at HSBHK is not connected with any account located in New York City or New York State (collectively "New York") and JIT does not have a bank account in New York either with HSBHK or with any other bank.

4. JIT does not have an office in New York and it does not conduct business of any kind in New York. Except for a registered address in Hong Kong where JIT is incorporated, JIT's only office is located in Shanghai, China.

5. JIT has been verbally advised by HSBHK in Hong Kong that JIT's bank account in Hong Kong has been restrained by HSBHK by virtue of an action and attachment commenced by Lauritzen Bulkers A/S ("Lauritzen") in New York in or about June, 2013 in the amount of $20,000,000 and that because of this JIT has no access to use of its funds in JIT's account at HSBHK in Hong Kong.

6. JIT has received and reviewed the "Report of Garnishee HSBC USA, N.A. in Response to Writ of Attachment and Garnishment." JIT has no bank account of any kind with HSBC USA N.A. ("HBUS"). I note that this Report states at paragraph 4 that "HBUS USA holds a correspondent account for the benefit of HBAP" (i.e. HSBHK as defined above). JIT has no correspondent or other account with HBUS and the "correspondent account" so described can only be an internal banking arrangement between HBUS and HSBHK. JIT has no knowledge of this HSBHK "correspondent account." I further note that the Report states in paragraph 6 that "HBUS has examined HBAP's correspondent account and has determined that the account contains no 'subaccounts' for Defendants."

7. Despite JIT's lack of any connection with New York or with HBUS or with any bank account of any type with any bank in New York, HSBHK has advised JIT that JIT has no access to JIT's funds with HSBHK in Hong Kong on account of the attachment issued by the Court in New York in this case. At the time of the attachment, JIT had funds at HSBHK in Hong Kong as follows:

HKD 52,427.57
HKD 290.00
AUD 1,464.56
HKD 300,000.00
USD 60,734.75

2

According to HSBHK, these funds remain unavailable to JIT because of the New York attachment and HSBHK's response to it.

8. The origin of the dispute with Lauritzen is that JIT, as charterer, chartered the M/V Ocean Prefect from Lauritzen, as disponent owner. According to Lauritzen, it had chartered this vessel from the vessel owner ("Vessel Owner"). JIT, in turn, arranged to ship cargo on the M/V Ocean Prefect by two fixtures, one with Tianjin Ruicheng International Transportation Co., Ltd. ("Tianjin") and one with Qingdao Shitian International Logistics, Ltd. ("Quindao") for the carriage of cargo from Xingang and Shanghai, China to Guanta Venezuela.

9. The charter party between JIT and Lauritzen is subject to arbitration in London and contains the following Clause 55:

> Liabilities for cargo claims, including customs fines if imposed shall be borne by Owners/Charterers in accordance with the Interclub New York Produce Exchange Agreement of 1966 and any amendments thereto. The party having paid the claim shall submit to the other party supporting documentation as soon as possible.
>
> (emphasis added)

10. The current version of the "Interclub" agreement is attached as Exhibit "A." This Interclub Agreement includes an "apportionment" formula whereby one party may seek recovery from the other party when the first party has "in fact borne" an amount on account of a cargo claim. The "apportionment" provision states in part:

3

> The amount of any Cargo Claim to be apportioned under
> this Agreement shall be the <u>amount in fact borne by the</u>
> <u>party to the charterparty seeking apportionment</u>, regardless
> of whether that claim may be or has been apportioned by
> application of this Agreement to another charter party.

                                                    (emphasis added)

11. JIT learned that the vessel encountered rough weather during the voyage and

    that the cargo was allegedly damaged. According to Lauritzen, a claim for the

    cargo damage was asserted by cargo interests against the Vessel Owner in

    Venezuela (but <u>not</u> against Lauritzen) and the Vessel Owner provided a P&I

    Club letter of undertaking to cargo interests. According to Lauritzen, it has

    provided a P&I Club letter of undertaking to the Vessel Owner to secure a

    possible claim the Vessel Owner may have against Lauritzen <u>if</u> the Vessel

    Owner is found liable to cargo interests in Venezuela.

12. JIT understands that Lauritzen is seeking security from JIT in the amount of

    $20,000,000. JIT is not a ship owner, is not a member of a Protection &

    Indemnity Association or "P&I Club" and has no ability to provide a P&I

    Club letter of undertaking as shipowners such as Lauritzen can routinely do at

    no cost to secure cargo claims.

13. According to JIT's information, as of this time, Vessel Owner has not paid or

    resolved the cargo claims asserted in Venezuela against it nor has Lauritzen

    paid or settled the claim the Vessel Owner has asserted against Lauritzen.

                                         4

I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct to the best of my knowledge, information and belief.

Name: Zhang Hui
Title: Employee of JIT

Employee of JIT

Executed:     Shanghai, China
              August 2, 2013

              August 2, 2013

# EXHIBIT "A"

## Inter-Club New York Produce Exchange Agreement 1996
### (as amended September 2011)

This Agreement, the Inter-Club New York Produce Exchange Agreement 1996 (as amended September 2011) (the Agreement), made on 1st September 2011 between the P&I Clubs being members of The International Group of P&I Associations listed below (hereafter referred to as "the Clubs") amends the Inter-Club New York Produce Exchange Agreement 1996 in respect of all charterparties specified in clause (1) hereof and shall continue in force until varied or terminated. Any variation to be effective must be approved in writing by all the Clubs but it is open to any Club to withdraw from the Agreement on giving to all the other Clubs not less than three months' written notice thereof, such withdrawal to take effect at the expiration of that period. After the expiry of such notice the Agreement shall nevertheless continue as between all the Clubs, other than the Club giving such notice who shall remain bound by and be entitled to the benefit of this Agreement in respect of all Cargo Claims arising out of charterparties commenced prior to the expiration of such notice.

The Clubs will recommend to their Members without qualification that their Members adopt this Agreement for the purpose of apportioning liability for claims in respect of cargo which arise under, out of or in connection with all charterparties on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms), whether or not this Agreement has been incorporated into such charterparties.

### Scope of application

This Agreement applies to any charterparty which is entered into after the date hereof on the New York Produce Exchange Form 1946 or 1993 or Asbatime Form 1981 (or any subsequent amendment of such Forms).

The terms of this Agreement shall apply notwithstanding anything to the contrary in any other provision of the charterparty; in particular the provisions of clause (6) (time bar) shall apply notwithstanding any provision of the charterparty or rule of law to the contrary.

For the purposes of this Agreement, Cargo Claim(s) mean claims for loss, damage, shortage (including slackage, ullage or pilferage), overcarriage of or delay to cargo including customs dues or fines in respect of such loss, damage, shortage, overcarriage or delay and include:

any legal costs claimed by the original person making any such claim;

any interest claimed by the original person making any such claim;

all legal, Club correspondents' and experts' costs reasonably incurred in the defence of or in the settlement of the claim made by the original person, but shall not include any costs of whatsoever nature incurred in making a claim under this Agreement or in seeking an indemnity under the charterparty.

(4) Apportionment under this Agreement shall only be applied to Cargo Claims where:

(a) the claim was made under a contract of carriage, whatever its form,

  (i) which was authorised under the charterparty; or

  (ii) which would have been authorised under the charterparty but for the inclusion in that contract of carriage of Through Transport or Combined Transport provisions, provided that

  (iii) in the case of contracts of carriage containing Through Transport or Combined Transport provisions (whether falling within (i) or (ii) above) the loss, damage, shortage, overcarriage or delay occurred after commencement of the loading of the cargo on to the chartered vessel and prior to completion of its discharge from that vessel (the burden of proof being on the Charterer to establish that the loss, damage, shortage, overcarriage or delay did or did not so occur); and

  (iv) the contract of carriage (or that part of the transit that comprised carriage on the chartered vessel) incorporated terms no less favourable to the carrier than the Hague or Hague Visby Rules, or, when compulsorily applicable by operation of law to the contract of carriage, the Hamburg Rules

(b) the cargo responsibility clauses in the charterparty have not been materially amended. A material amendment is one which makes the liability, as between Owners and Charterers, for Cargo Claims clear. In particular, it is agreed solely for the purposes of this Agreement:

    (i) that the addition of the words "and responsibility" in clause 8 of the New York Produce Exchange Form 1946 or 1993 or clause 8 of the Asbatime Form 1981, or any similar amendment of the charterparty making the Master responsible for cargo handling, is not a material amendment; and

    (ii) that if the words "cargo claims" are added to the second sentence of clause 26 of the New York Produce Exchange Form 1946 or 1993 or clause 25 of the Asbatime Form 1981, apportionment under this Agreement shall not be applied under any circumstances even if the charterparty is made subject to the terms of this Agreement; and

(c) the claim has been properly settled or compromised and paid.

(5) This Agreement applies regardless of legal forum or place of arbitration specified in the charterparty and regardless of any incorporation of the Hague, Hague Visby Rules or Hamburg Rules therein.

## Time Bar

(6) Recovery under this Agreement by an Owner or Charterer shall be deemed to be waived and absolutely barred unless written notification of the Cargo Claim has been given to the other party to the charterparty within 24 months of the date of delivery of the cargo or the date the cargo should have been delivered, save that, where the Hamburg Rules or any national legislation giving effect thereto are compulsorily applicable by operation of law to the contract of carriage or to that part of the transit that comprised carriage on the chartered vessel, the period shall be 36 months. Such notification shall if possible include details of the contract of carriage, the nature of the claim and the amount claimed.

## The apportionment

The amount of any Cargo Claim to be apportioned under this Agreement shall be the amount in fact borne by the party to the charterparty seeking apportionment, regardless of whether that claim may be or has been apportioned by application of this Agreement to another charterparty.

Cargo Claims shall be apportioned as follows:

(a) Claims in fact arising out of unseaworthiness and/or error or fault in navigation or management of the vessel: 100% Owners

save where the Owner proves that the unseaworthiness was caused by the loading, stowage, lashing, discharge or other handling of the cargo, in which case the claim shall be apportioned under sub-clause (b).

(b) Claims in fact arising out of the loading, stowage, lashing, discharge, storage or other handling of cargo: 100% Charterers

unless the words "and responsibility" are added in clause 8 or there is a similar amendment making the Master responsible for cargo handling in which case: 50% Charterers 50% Owners
save where the Charterer proves that the failure properly to load, stow, lash, discharge or handle the cargo was caused by the unseaworthiness of the vessel in which case: 100% Owners

(c) Subject to (a) and (b) above, claims for shortage or overcarriage: 50% Charterers 50% Owners unless there is clear and irrefutable evidence that the claim arose out of pilferage or act or neglect by one or the other (including their servants or sub contractors) in which case that party shall then bear 100% of the claim.

(d) All other cargo claims whatsoever (including claims for delay to cargo): 50% Charterers 50% Owners unless there is clear and irrefutable evidence that the claim arose out of the act or neglect of the one or the other (including their servants or sub-contractors) in which case that party shall then bear 100% of the claim.

## Security

(9) If a party to the charterparty provides security to a person making a Cargo Claim, that party shall be entitled upon demand to acceptable security for an equivalent amount in respect of that Cargo Claim from the other party to the charterparty, regardless of whether a right to apportionment between the parties to the charterparty has arisen under this Agreement provided that:

(a) written notification of the Cargo Claim has been given by the party demanding security to the other party to the charterparty within the relevant period specified in clause (6); and

(b) the party demanding such security reciprocates by providing acceptable security for an equivalent amount to the other party to the charterparty in respect of the Cargo Claim if requested to do so.

## Governing Law

(10) This Agreement shall be subject to English Law and the exclusive Jurisdiction of the English Courts, unless it is incorporated into the charterparty (or the settlement of claims in respect of cargo under the charterparty is made subject to this Agreement), in which case it shall be subject to the law and jurisdiction provisions governing the charterparty.

American Steamship Owners Mutual Protection & Indemnity Association, Inc.
Assuranceforeningen Gard
Gard P&I (Bermuda) Ltd
Assuranceforeningen Skuld
The Britannia Steam Ship Insurance Association Ltd.
The Japan Ship Owners' Mutual Protection and Indemnity Association
The London Steam-Ship Owners' Mutual Insurance Association Ltd.
The North of England Protecting and Indemnity Association Ltd.
The Shipowners' Mutual Protection and indemnity Association (Luxembourg)
Skuld Mutual Protection and Indemnity Association (Bermuda) Ltd.
The Standard Steamship Owners' Protection and Indemnity Association (Asia) Ltd
The Standard Steamship Owners' Protection & Indemnity Association (Bermuda) Ltd.
The Standard Steamship Owners' Protection and Indemnity Association (Europe) Ltd
The Standard Steamship Owners' Protection and Indemnity Association (London) Ltd
The Steamship Mutual Underwriting Association Ltd
The Steamship Mutual Underwriting Association (Bermuda) Ltd.
Sveriges Angfartygs Assurans Forening (The Swedish Club)
The United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd.
United Kingdom Mutual Steam Ship Assurance Association (Europe) Ltd
The West of England Ship Owners Mutual Insurance Association (Luxembourg)